ARTURO PINTO, Plaintiff and Appellant, v. THE UNKNOWN HEIRS OF ANDREW PETER DREW, ETC., Defendants and Appellees.

No. 5988. Argued April 25, 1933.—Decided December 22, 1933.

V. *Polanco de Jesús* for appellant.    L. *Mendín* for appellees.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

Arturo Pinto brought, in the District Court of Arecibo, an action against the unknown heirs of Andrew Peter Drew to recover the sum of $4,000, with interest thereon, secured by mortgage, and $740 additional as money advanced to Drew, during his life, for various purposes.

Margaret Anne, Tomás, Mary S., and Catherine Drew, brothers and sisters of Andrew Peter Drew, appeared in the suit as his heirs and raised several preliminary objections which were overruled, whereupon they finally answered the complaint. They denied the existence of any indebtedness owing from the decedent to Pinto, and set up that the mortgage deeds on which the complaint was based were simulated.

The plaintiff moved to strike out certain particulars of the answer and demurred to the same on the ground that it did not state facts sufficient to constitute a defense to the complaint. The court granted in part the motion to strike out, and overruled the demurrer.

The issue having thus been joined, the case went to trial. Both parties introduced their evidence and the court rendered judgment for the defendants, holding as proven the following facts:

"That on May 1, 1929, Andrew Peter Drew, ancestor of the defendants, executed before Notary Victoriano M. Fernández, a loan and mortgage deed, numbered 35, whereby he acknowledged to be indebted to Arturo Pinto in the sum of $2,000, and it was recited in this instrument that said sum had been received from the lender in installments, and that a liquidation having been made on the date of the execution of the deed, it showed a balance amounting to the

aforesaid sum; . . . . In order to secure the payment of the $2,000 and of an additional sum of $400, Andrew Peter Drew constituted a voluntary first mortgage on three properties belonging to the conjugal partnership which existed between him and his wife. The encumbered properties are described thus:

(Here follow the descriptions of three rural properties situated in the ward of Coto, Manatí, comprising ten, eight and fourteen acres (*cuerdas*), respectively.)

"That on May 3, 1929, the defendants' ancestor, Andrew Peter Drew, executed deed No. 37 of the protocol of Notary Victoriano M. Fernández, whereby the said Andrew Peter Drew acknowledged to have received from Arturo Pinto, prior to the execution of the instrument, the sum of $2,000 as a loan, and in consequence thereof he agreed to pay to the creditor the sum of $4,000 within four years, counted from the date of the execution of deed No. 35, that is, from May 1, 1939, and as security for the payment of the aforesaid sum he extended the mortgage which he had constituted on the three properties. . . .

"   *          *          *          *          *          *          *

"That on November 15, 1929, Arturo Pinto paid to Ignacio Valderrama the sum of $112 which Andrew Peter Drew owed to him.

"That on May 3, 1929, the plaintiff Pinto paid to Attorney Victoriano M. Fernández the sum of $52.45 for professional services rendered in the execution of deeds Nos. 35 and 37 of the first and third of May, respectively, which we have already mentioned.

"That on May 5, 1929, there was paid by the plaintiff to Attorney José R. Rodríguez Cebollero the sum of $10 to cover the expenses incurred in the case of Rosalía Kelly.

"That on May 17, 1929, the plaintiff paid to Attorney Antonio Quirós Méndez the sum of $10 for professional services rendered to Andrew Peter Drew in the execution of deed No. 17.

"That on December 1, 1929, the plaintiff paid to Attorney Gustavo Cruzado Silva the sum of $25 as counsel fees in the case of Rosalía Kelly v. Andrew Peter Drew.

"That on December 1, 1929, the plaintiff paid to Attorney Gustavo Cruzado Silva the sum of $80 to cover the fees charged by the latter in defending the action brought by Rosalía Kelly against Andrew Peter Drew.

"That on May 5, 1930, the plaintiff, on behalf of Mr. Drew, finished paying to Tabacaleros de Manatí, Morovis y Barceloneta, Inc., the sum of $209.98.

"That on August 30, 1929, the plaintiff paid the sum of $36.49 as taxes owed on the properties belonging to Andrew Peter Drew, and on February 17, 1930, he paid a like amount. The plaintiff also paid other small items amounting to $11.35.

"That on September 6, 1926, Arturo Pinto wrote to Andrew Peter Drew a letter which, literally copied, reads as follows:

" 'Santurce, Sept. 6/26.—My dear Mr. Drew: Yesterday I was in Manatí and was going to call on you when a visitor arrived and I had to take care of him while María was preparing some dinner.—But though probably I will be there again, on the coming Sunday, I just wish to know if it is true you are contemplating selling some of your low land and what will be your price per *cuerda* in case you feel like selling a small portion of it.—You know how often I have expressed my desires of having a piece of land, and if we could come to an understanding, I on my part will do a little sacrifice in trying to obtain some.—With best regards, and best wishes for your good health, I am as always, affectionately yours, Arturo.—P.S. If you can't write, please advise María if you don't want to wait till Sunday.'

"That the three properties mortgaged by Andrew Peter Drew to Pinto are recorded in the name of Drew in the registry of property; that on November 1, 1905, he acquired the parcel of 14 acres during his marriage, by purchase from Blasina Crespo, and it was recorded by virtue of a possessory title proceeding wherein it was stated that it was worth $160. That Drew acquired the two remaining parcels of 8.75 and 10 acres, respectively, while married to Catherine Drew by purchase from Tomás Ronan and Catalina Pickering, the 8-acre parcel for $400 and the 10-acre parcel for $300, by deed No. 37 executed in Manatí on May 22, 1929, before Notary Ignacio Carballeira Cañellas.

"That the 14-acre property is assessed by the Treasury Department, for taxation purposes, at $1,180 and pays $26.80 annually; the rural property of 8.75 acres is assessed at $590 and pays $13.34 annually; and the 10-acre property is assessed at $580 and pays $13.12 annually.

"That the plaintiff, Arturo Pinto, appears as taxpayer in the Municipality of Manatí, for the fiscal year 1930–31, owning the following properties: a lot measuring 400 square meters, with two houses there in, situate on Barbosa Street and valued at $1,800; and a small rural property of 8 acres, valued at $300.

"That on or about April 9, 1929, in the ward of Coto, Manatí, Andrew Peter Drew assaulted and -battered Rosalía Kelly, inflicting several lesions and bruises on her body, for which he was prosecuted before the Municipal Court of Manatí, and sentenced on April 11, 1929, to pay a fine of $50 and to be confined in jail one day for each dollar left unpaid.

"That in consequence of the assault and battery committed by Andrew Péter Drew against Rosalía Kelly, the latter brought, in the District Court of San Juan, an action against him (Civil Case No. 9331), claiming $2,000 as damages. The complaint in that action was filed in the District Court of San Juan, on April 22, 1929.

"That Andrew Peter Drew died in Manatí, P. R., on July 1, 1930, without ascendants or descendants but leaving four brothers report in this court, notifying it of the death of the aforesaid Drew,

"That on August 28, 1930, plaintiff Arturo Pinto filed a written report in this court, notifying it of the death of the aforesaid Drew, without leaving any children, wife, or next of kin, and stating that the informant was the attorney in fact of the decedent at the time of his death, holding the power of attorney which he attached to the petition, wherein he requested that, in accordance with sections 21 and 22 of the Special Legal Proceedings Act proper steps be taken by the court to protect the estate of the decedent, Drew.

"The power of attorney which the plaintiff attached to his petition shows that Andrew Peter Drew, by deed No. 17, dated May 17, 1929, executed before Notary R. A. Quirós Méndez, granted to Arturo Pinto full general power to manage all the estates belonging to the grantor, to collect the rents and profits thereof and all debts due to him, to purchase property and sell all such as was already in possession of the grantor, and generally to do all acts pertaining to the person and property of Mr. Drew.

"That on the day following the death of Andrew Peter Drew, the plaintiff Pinto, accompanied by his mother María Andino and his wife Juana Rosado came to the house of the deceased and searched his trunks, collecting certain documents and ordering the destruction of the others."

The opinion of the trial court went on to state as follows:

"The foregoing facts having been proved, there remained but two essential questions in controversy to be decided.

"Whether the mortgage deed executed by Andrew Peter Drew in favor of Arturo Pinto were simulated.

"And whether the amounts paid by Arturo Pinto during the life of Mr. Drew and in his name were so paid by the former with his own money and by way of a loan to the latter, or whether such payments were only made pursuant to the authority held by Pinto as Drew's attorney in fact.

"From all the evidence adduced in this case, the court reaches the conclusion that the two mortgage deeds were simulated and that there was no consideration for their execution."

The court then fully states the reasons which led it to its announced conclusion, and in regard to the second question above referred to, it says:

"As to the amounts claimed by the plaintiff in the second cause of action, we are of opinion that, apart from the fact that many of the arguments set forth in the detailed statement exhibited with the complaint have not been satisfactorily proved, grave doubts have arisen in our mind respecting the circumstances in which the plaintiff, Pinto, made these payments in the name of Drew. Those doubts are based on the fact that, as Pinto was the attorney in fact of Andrew Peter Drew, according to deed No. 17 of May 17, 1929, executed before Notary R. A. Quirós Méndez, and as this power of attorney was so broad that it vested him with authority not only to receive the rents and profits of the grantor's properties, but also to even sell or mortgage the latter, the plaintiff has failed to convince us that said sums were paid by him, in the name of Drew, with his own funds, because the payments could have been made with Mr. Drew's money since Pinto was his attorney in fact and the person who administered all the business of the deceased."

Feeling aggrieved by that decision, the plaintiff appealed to this Supreme Court. He has assigned in his brief eighteen errors, the first two of which relate to the motion to strike out and to the demurrer filed by the defendant. In our opinion, neither of them has been committed.

Perhaps the answer contained excessive allegations, unnecessary repetitions, and immaterial assertions which properly should have been stricken out, but we are convinced that in failing to do so the court did not commit any prejudicial error.

By the demurrer, the question was raised that the answer did not state facts sufficient to constitute a defense because, since the defendants were not forced but voluntary heirs, they have no right to plead the simulation of the deeds executed by Andrew Peter Drew.

Heirs are the persons who, by the will of the testator or by operation of law, succeed by universal title to all the rights and obligations of the decedent upon his death, and are divided into testamentary or instituted heirs and legal or intestate heirs, the former group being subdivided into forced heirs and voluntary heirs. 17 *Enciclopedia Jurídica Española* 715.

Here there was no will; nor were there any ascendants or descendants. There are only brothers and sisters in whom the law vests the inheritance. Their interest is manifest. From the facts stated by them in their answer, it can not be inferred that it was the intention of their predecessor in interest to acknowledge gratuitously and permanently to Pinto the amount he claims in his complaint; on the contrary, it appears therefrom that the acknowledgment of the debt was made only temporarily and that Drew retained in his possession a counter deed executed by Pinto.

Manresa in his commentaries on the Civil Code, says:

"In a judgment rendered on April 18, 1901, it has been declared, in accordance with the rule now discussed, that 'it is evident that one who is not a party to a contract nor derives any authority or representation from the contracting parties, according to section 1257 and 1302 of the Civil Code, has no right of action, or legal capacity to impeach the validity of such contract.'

"As may be seen from the same doctrine, and it is clearly evident, it is incumbent on the heirs to bring the action for nullity; but this is subject to the condition that their predecessor in interest should have been entitled to bring it, and it is so provided in the doctrine that we have adopted in connection with section 1306." 8 Manresa, Commentaries on the Civil Code (1931 ed.), 738.

In the instant case, the ancestor could have set up the fact of simulation against the claim of Pinto.

The third error assigned was not committed either. The court did not err in admitting evidence concerning the prosecution of Andrew Peter Drew for assault and battery on the person of Rosalía Kelly. That evidence, together with other evidence subsequently adduced, tended to explain the motive for the simulation set up by the defendants and was therefore relevant.

The fourth and fifteenth assignments are intimately connected with each other. The appellant maintains that the court erred in holding as proved the existence of a suit brought by Rosalía Kelly against Andrew Peter Drew for the recovery of damages sustained by reason of an assault and battery committed by Drew upon her person, and in ordering that a certain certificate relating to the existence of said suit, and the admissibility of which it had denied when the document was offered in evidence by the defendants, be made a part of the record; and in considering said certificate when rendering judgment.

We are inclined to believe that the trial court erred in acting in the manner above indicated; but its error should not be a ground for reversal, as it caused no prejudice to the plaintiff, since the fact of the existence of the suit was established by evidence independent of said certificate.

The eighteenth assignment is formulated thus:

"The court erred in decreeing the nullity of the mortgages of the plaintiff without there being any cross complaint filed by the defendants specifically praying for such annulment, apart from the fact that the defendants failed to prove their status as heirs of Andrew Peter Drew."

The judgment confined itself, of course, to a dismissal of the complaint on the ground of the nonexistence of the credits secured by the mortgagor. Under the circumstances of the case, we do not think that it was necessary to file a cross complaint. The simulation could have been pleaded,

as it was in fact pleaded, in the answer as new matter of defense and opposition to the complaint.

Regarding the claim that the defendants failed to prove that they were the heirs of Andrew Peter Drew, it will suffice to say that the action was brought against the unknown heirs of Drew; that the defendants appeared and alleged their status as heirs since they were brothers or sisters of Drew and the decedent had left no will, nor descendants or ascendants, the plaintiff then amending his complaint and including them as defendants; and that at the close of the evidence for the defendants, counsel for the latter made the following statement, which was incorporated in the record without objection: "Attorney Mendín: It was admitted by the opposite party that the defendants are members of the succession of Drew, and we omit the presentation of this record. We rest."

This was sufficient to acknowledge their standing in the suit. The estate of Drew was not settled in the proceedings. It was merely freed from plaintiff's claim.. There was no error.

Assignments numbered 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 16 refer to the weighing of the evidence relating to the simulation. We shall consider them jointly.

Does the evidence introduced prove that the mortgage deeds were fictitious? `Let us see.

It appears from the evidence that, at the time of the events which gave rise to this suit, Andrew Peter Drew was an old man, a widower, who had aged working in sugar factories in a position known as *"azucarero."* He owned three small rural properties, acquired during marriage. In April 1929, a complaint was filed against him in the Municipal Court of Manatí charging him with having assaulted and battered Rosalía Kelly, and according to a copy of the sentence, pronounced by said court on the 11th of the same month and year, he pleaded guilty. He requested the court to stay the

execution of the judgment in consideration of his age—over eighty years—and the court acceded thereto.

Shortly thereafter he received certain documents. He sent for Manuel Marchán González, and according to the testimony of the latter—

"He told me that Miss Rosalía had accused him again and he showed me some papers. I told him, that it was not a criminal complaint but a civil complaint for damages. He asked me to call on Attorney Rodríguez Cebollero in order that the latter should take charge of the defense, and stated that he would get money for that purpose. Two days afterward he sent me to Mr. Santiago Crespo in order to obtain the money for Rodríguez Cebollero, and Santiago Crespo gave me eight dollars, two for my expenses and six for Attorney Rodríguez Cebollero. I went to San Juan the next day and delivered to Attorney Rodríguez Cebollero the papers and Drew's message, together with the six dollars, and Attorney Rodríguez Cebollero prepared a sworn statement or affidavit of merits to remove the cause."

Santiago Crespo, to whom the witness referred, testified that he had leased 24 acres of land from Drew for $150 annually, and that he paid the rent to Drew and lately to the latter's attorney in fact, Pinto, to whom he paid up to $82.50. He stated that Drew lived poorly, alone, in a house with scant furniture, working all the time up to his death; that he was "a man not given to ostentation."

The attorney in fact, Pinto, is the plaintiff in this case. It seems that he maintained a close friendship with Drew. When Drew came to San Juan for a medical examination at the Presbyterian Hospital, he stayed at his house, and Pinto took care of all the details and the payment of the expenses; and he came to Pinto for assistance when he was sued by Rosalía Kelly. It was Pinto who procured the intervention of Attorney Cruzado Silva, to whom he paid as fees first $25 and later $80, on December 1 and December 16, 1929, respectively, having paid previously, on May 5, 1929, $10 to Attorney Rodríguez Cebollero for the same purpose. All of this appears from plaintiff's own evidence.

On cross-examination by counsel for the defendants, Pinto testified that he was a postal employee earning $180 monthly; that he was in New York and worked in a soap factory as a laborer, and returned to Puerto Rico with savings amounting to $6,000. He opened an account in the Banco Territorial, at Manatí, but delivered most of the money to his father for safekeeping, and that he could not recall the exact amount, because between that date and the date of the trial —March 1931—some eight years had elapsed.

Upon being asked: "When you gave Mr. Drew the first two sums of $1,000, covered by deed No. 35, how did you deliver the money to Mr. Drew?" he answered: "My father tried to borrow some money for me; or I offered to buy the property but he refused to sell; then he needed some money and there was a certain measure of friendship between him and me, and he asked me to lend him some money and I told my father: If so and so comes to see you, give him the money."

He further stated that he made three loans to him, but that he did not remember the dates. He did not keep the data. He said that he thought that since a deed had been executed, all the rest was null.

The second mortgage deed was executed three days after the first one. Pinto testified that he had delivered the $2,000 to Drew in cash, and he seemed to suggest that he did so in the presence of the notary. When his attention was called to the fact that the notary had not certified to the delivery of the money in the deed, he answered: "I do not know as to that; I cannot answer. His attention might be called to it."

When he was asked to explain why in spite of the fact that Drew had received on the same day that amount of money, he, Pinto, appears as paying for Drew the fees of the notary, he answered: "I am going to explain. The man needed two thousand dollars and he needed the full amount, and he told me: Pay the attorney and you and I

will fix it up later. He needed, I do knot know for what purpose, the whole of the $2,000."

Fourteen days afterward, on May 17, 1929, Drew granted a general power of attorney by deed in favor of Pinto, and the latter in explaining the reasons therefor stated: "Because he felt ill and he needed someone to go to the farm and look after it."

Although really it can not be asserted that it should be impossible for Pinto to have returned from the States, with $6,000 saved from his wages, or out of the salary he earned to have paid his expenses and saved $4,000 to loan to Drew, it should be remarkable if this were so.

Likewise it is strange that upon the deeds being impeached Pinto should have failed to explain with precision how and when were made the three loans which were subsequently merged in the first mortgage for $2,000 relying instead on the recitals of the instrument itself, especially since he later testified that he kept some sort of an account. The situation is rendered still more remarkable by the fact that, when the question of the second loan for $2,000 arose, Pinto confessed to be ignorant of the use to which Drew put the money thus acquired, notwithstanding the intimate relationship existing between them which culminated in the execution shortly thereafter of the general power of attorney; but the case seems to us to be the more striking when we take into consideration the value of the property and the fact that Drew was the owner of but one-half thereof, since the other half belonged to his wife's heirs.

All of this by itself, however, would not be sufficient to warrant a disregard of the deeds. But there is more. The friends and relatives of Drew who went to visit him observed no change whatsoever in his mode of living—which they characterized as poor. No new business was undertaken; no account settled by him. On the contrary, according to the plaintiff himself, it was the latter who paid everything

for him. The $2,000 disappeared without leaving the slightest trace.

But there is still more. When Drew was *in extremis* none of his relatives was present. Pinto was the one who arranged and directed everything. How did he act? We are informed as to this by the deposition of Hermenegilda Colón and the testimony of Natividad Menéndez and Inés Collazo.

Hermenegilda Colón asserted that she had heard from the lips of Drew that the latter had executed a simulated mortgage in favor of Pinto, and she later amplified her statement, thus: "He told me that he had made a simulated mortgage because he had some litigation pending with Rosalía Kelly . . . He told me that he held a counter deed." She also asserted that she saw Pinto in Drew's house "one day after his death," accompanied by his mother María Andino and his wife Juana, that they "gathered the trunks, searched them, and found certain documents, and then ordered that the rest be burned.

Natividad Menéndez testified that when Drew died many people called at his house: "Mrs. María Andino, Mr. Pinto, and anyone who wished to see the deceased" . . . that "Mrs. Andino went to the trunk and took some papers from it which she gave to her daughter-in-law" . . . the daughter-in-law is "Mrs. Pinto, and they took the papers with them and never returned . . . half of the papers remained in the trunk and Arturo Pinto directed a man who is here today, a witness, to burn them."

The witness to whom Natividad Menéndez referred was Inés Collazo. He testified that he lived in the "farm of Master Andrew" and that on the day following his death he burned, by order of Pinto, certain papers they had taken from an open trunk.

When the deposition of Hermenegilda Colón was taken the plaintiff objected to the admissibility of what Drew had said, and the deposition was admitted subject to the noted

objections. The appellant in his brief urges that the evidence was inadmissible. Conceding without holding that this was so, and disregarding the deposition in forming our own conclusions, we think that the evidence regarding the search in Drew's trunk and the taking of the documents, an act denied by Pinto, when added to the other circumstances surrounding the case, is sufficient to support the finding made by the trial judge, thus:

"That these deeds were fictitiously executed by Drew in favor of Pinto solely for the purpose of evading the claim for damages sought to be enforced by Rosalía Kelly appears from the very terms of the documents and the circumstances surrounding these contractual relations."

Was the district court also justified in dismissing the second cause of action?

Continuing its reasoning, and following its statements above quoted, the court in its statement of the case and opinion expressed itself as follows:

"So that, as to the items that Pinto has showed to have paid to other persons in the name of Drew, it is acknowledged by the trial judge that Pinto actually made such payments. Now, with whose funds? His principal's or his own? Here is a gap in the plaintiff's case. We can undersand it, because the plaintiff never mentioned in his complaint nor in his evidence the fact that he was Mr. Drew's attorney in fact. This circumstance appeared in the course of the evidence presented by the defendants, who produced the entire record of the proceedings instituted by the plaintiff concerning the administration of the property of the deceased for lack of known heirs, and offered in evidence the power of attorney together with said record.

"With that evidence before him, the judge is in no position to decide whether the amounts paid by Pinto to third persons can be considered as loans to the deceased Drew. And as there is a total absence of evidence on this point, the presumption is that said sums were paid by Pinto, in his capacity as attorney in fact, out of Drew's rents. This being so, Pinto can not recover sums which although paid by him, were not disbursed from his own funds, but from those of his principal."

We know from the evidence that the power of attorney was made effective. At least we know that Pinto received during six months the rentals on 24 acres of land belonging to Drew. In this respect Pinto himself testified: "Did Mr. Drew lease his property? . . . To whom did he lease it?—To Santiago Crespo.—How much did he pay?—I don't remember how much he paid.—Did you receive any money after Drew executed the mortgage deed?—Yes, sir, and I gave it to Drew.—Do you remember when you received the money?—I would have to see the books to ascertain when it was. I can not remember the date so as to be able to say on such a day or month.—When you received the money from Crespo, do you remember the amount?—I tell you I can not remember exactly how much it was, nor the date."

We appreciate the state of mind of the trial judge while weighing the evidence introduced. There may be some truth in these last statements of the witness, but the incredibility of the testimony of Pinto in its essential particulars, prejudices his cause. In view of all the attendant circumstances, we do not think that the finding made by the lower court was erroneous.

The seventeenth error assigned refers to the imposition of costs. If the conclusions of the court with respect to the causes of actions exercised by the plaintiff are well founded, as we have acknowledged they are, then there is no doubt as to the imposition of costs. The plaintiff should pay them. There was no error.

The judgment appealed from must be affirmed.